Plaintiff was injured in the service of another employer and received temporary total disability benefits from 26 July 1989 through 22 August 1991, when the case was concluded with a compromise settlement agreement for a lump sum payment of $17,500.00. Medical records of this period indicate he was under active treatments for "severe myofacial back and buttock pain" on referral from the Pain Control Center at Baptist Hospital as late as mid-February 1991, and had a return appointment in March. The chiropractor who had seen him fifty times declared that was "permanently 100% disabled" from his former employment as a brick mason. However, he immediately returned to that work as a mason following the "clincher", and, according to his testimony, worked frequently, for up to 50 hours per week, into April 1992. He was employed by this defendant that month, and after working for him for 22 1/2 hours over five days, reinjured his back lifting a mortar mixer. As the plaintiff did not affirmatively state and misrepresent to the defendant that the condition of his back would not put him at risk of reinjury or deny that he had a prior back injury, the Deputy Commissioner correctly decided that plaintiff's claim was not barred, as defendants argued, for fraudulently obtaining the employment. Larson, The Law of Workman's Compensation, § 47-53; Johnson v. HighPoint Hospital, I.C. No. 013804, 23 March 1994.
The presumption of disability that arises with proof that plaintiff suffered a period of disability was amply rebutted by the medical evidence and lack of credible evidence to justify plaintiff's refusal to seek employment. The Deputy Commissioner also found that the plaintiff did not suffer from another pain syndrome, reflex sympathetic dystrophy (RSD), based on the evidence before him. The contrary medical opinion was based on subjective complaints interpreted by a physician who was not aware of some very relevant facts about plaintiff's medical history. (See depo. of Dr. Hill, pps. 62-64 and 74-77). Plaintiff has moved to reopen the evidence and supported the request with correspondence from doctors. These letters leave unclear the degree to which the opinions are again based on subjective complaints, and whether the malady, if he does have it, would properly relate to the 1992 injury, or the 1989 injury and unjustified inactivity since 1992. There was not an objectively verifiable difference in plaintiff's back condition before and after the subject second injury (see depo. of Dr. Curling, pps. 14-15). Dr. Curling relates the RSD to plaintiff's "original" injury (probably meaning the April, 1992 injury), with which plaintiff's complaints are "consistent", and hopes that it will "facilitate Mr. Puzio's claim." This represents a change in Dr. Curling's opinion, based on changes in plaintiff's condition that manifested themselves since his deposition testimony. It does not show that the RSD, if he has it, was debilitating when the hearing Deputy concluded plaintiff could work. The motion exhibit describing objective signs — changes over time, e.g., "increased hair loss, decreased toenail growth and intermittent episodes of edema and cyanosis" — was dated the day after its author first saw the plaintiff. Later letters suggest that the problem is being overcome by physical therapy and injections. The motion has not been supported by the more conclusive test, a bone scan, in the years since the alleged onset. (See depo. of Dr. Hill, pps. 71-72.) Plaintiff has failed to forecast additional evidence that would be persuasive on the degree of plaintiff's disability duringperiod covered by the evidence before the Deputy Commissioner. Plaintiff is entitled to move for additional benefits pursuant to N.C. Gen. Stat. § 97-42, if he believes the evidence justifies it, following this award. The factual questions raised by a reopening motion would likely justify a full hearing, but that is not necessary to resolve the issues before us.
Consequently, the Full Commission exercises its discretion to deny the motion to reopen this record. Based on the Deputy Commissioner's first hand evaluation of the witnesses, his award is affirmed.
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act, with the defendant employing three or more regular employees.
2. The date of any alleged injury by accident is 23 April 1992.
3. At all times pertinent hereto, there was an employee-employer relationship between the plaintiff and the defendant.
4. Ohio Casualty Insurance Company is the insurance carrier on the risk.
5. Plaintiff has not worked for the defendant from 23 April 1992 and continuing through the date of the hearing.
* * * * * * * * * * * * * *
Based upon the competent evidence of record, the Full Commission makes the following
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was 34 years old, with a date of birth of 27 July 1959. Plaintiff had completed high school and one year of college in Criminology. Plaintiff had worked as an auto mechanic, in the airline industry servicing and moving aircraft, in sales, and as a brick mason.
2. Plaintiff sustained two prior work-related injuries before his present claim. The first was an injury to his knee which did not result in any lost time from work. The second was an injury to his back which kept plaintiff out of work for more than two years, between July 1989 and August 1991. Plaintiff was paid his last compensation for his second injury on or about 28 August 1991, and he returned to work about one week later as a bricklayer, although he claimed to be unable to find any jobs within his restrictions during the prior two years. For this back injury, plaintiff was paid $40,424.00 in temporary total disability compensation, $17,500.00 for entering into a Compromise Settlement Agreement, and $13,900.00 in medical compensation. In addition to receiving workers' compensation, plaintiff had received compensation from a private disability plan.
3. Plaintiff received conservative treatment for the 1989 back injury, with no surgery. The medical care included about 50 chiropractic treatments, and treatment at the Pain Control Clinic at Baptist Hospital. Plaintiff was diagnosed at the Pain Control Clinic with myofascial pain syndrome. When his physicians released plaintiff to return to work, he was given restrictions to perform light-sedentary work and was strongly instructed not to return to work as a brick mason.
4. About a week after he received the settlement from that case, plaintiff returned to work as a brick mason. He continued to work as a brick mason for various employers for about seven months. Plaintiff testified that he was pain-free during these seven months while performing work which was substantially more demanding than allowed by his restrictions. In April 1992 plaintiff began to work for the defendant as a brick mason and he continued at this job for four days, working 22.5 hours. Defendant's employees usually worked eight hours per day during a five-day work week, and plaintiff was paid $13.00 per hour. Plaintiff earned an average weekly wage of $520.00 per week at the time of his injury.
5. When plaintiff applied for the job with defendant, he did not tell the defendant of his prior injury to his back, that he had recently been out of work for two years, that he was restricted by his physicians to light-sedentary work, or that his doctors had instructed him not to return to work as a brick mason. If plaintiff had given this information to defendant, he would not have been hired to perform a job outside his restrictions. However, plaintiff was not asked about his physical restrictions, and had been able to perform the job of a brick mason for the prior seven months. Therefore, plaintiff was not necessarily deceitful when he let the defendant believe that he could perform the job.
6. On 23 April 1992 plaintiff was lifting a mortar mixer when he experienced a sudden onset of low back pain. Plaintiff reported the incident to his supervisor and was told to go home. The next day plaintiff returned to the chiropractor who had treated him for his prior injury to his back and told the chiropractor he had hurt his back at work. The chiropractor gave plaintiff an excuse from work. Plaintiff was paid temporary total disability compensation for a period of time after 23 April 1992 based on an average weekly wage of $455.00, but the parties were unable to execute an I.C. Form 21 Agreement for Compensation.
7. After about a month, the chiropractor referred plaintiff to Dr. O. Del Curling, Jr., a neurosurgeon. At the first examination by Dr. Curling, plaintiff's straight leg raising test results were positive at 30 degrees on the right. The history and examination of plaintiff were consistent with lumbar radiculopathy, and plaintiff had sustained a far lateral disc herniation on the right at spinal level L4-5. The herniation was a significant exacerbation of a pre-existing condition at spinal level L4-5 and was caused by the incident of 23 April 1992 at work.
8. On 24 June 1992 (two months after the incident at work) Dr. Curling performed a diskectomy on the right at spinal level L4-5 and a foraminotomy on the right at level L5-S1. The first post-operative examination was on 28 July 1992 (about one month after surgery). At this examination the results of a straight leg raising test were negative, and plaintiff was taking no medication. Plaintiff demonstrated a decreased range of motion in all directions, but his responses were quite exaggerated. Plaintiff complained of bilateral leg numbness, which is an unexpected result from a right-sided surgery and was not caused by any anatomical defect. Dr. Curling ordered a myelogram/CT Scan and a repeat MRI. The results of these tests were generally within normal limits. Plaintiff claimed that physical therapy aggravated his symptoms, that medication did not help his symptoms, but that chiropractic treatment caused improvement.
9. On November 17, 1992 (six months after surgery), Dr. Curling was unable to explain plaintiff's continued complaints of pain, "numbness and `paralysis'" (note of 19 January 1993). Based on the plaintiff's physically observable condition, Dr. Curling felt plaintiff had stabilized at a 10% impairment, and could do "light-duty type jobs". Dr. Curling felt plaintiff's complaints might be explained by a developing case of reflex sympathetic dystrophy (hereinafter "RSD"), and recommended evaluation, including "diagnostic sympathetic blocks", and treatment at the Pain Control Clinic at Baptist Hospital (hereinafter "Baptist Hospital"). The insurance carrier refused to authorize any treatment at Baptist Hospital, but agreed to treatment at the Pain Management Center at High Point Regional Hospital (hereinafter "High Point Hospital"). Plaintiff refused treatment at High Point Hospital because he had received treatments at Baptist Hospital's pain clinic for his prior back injury (when he was out of work for two years with a diagnosis of myofascial pain syndrome), and because of transportation problems. Plaintiff lived in Winston-Salem, and his wife and daughter worked, but the family had only one car. There ensued an impasse between plaintiff and the insurance carrier which left plaintiff's medical treatment in limbo for several weeks. During this time, Dr. Curling became irritated at the insurance carrier and wrote a letter to the claims adjuster. Dr. Curling wrote that he assumed his patients were telling him the truth about their pain unless there was strong contradictory evidence. Dr. Curling reviewed the usual success rate he had for back surgery, but noted that, "As we all know, unfortunately, workers' comp [compensation] patients don't seem to do nearly as well."
10. There was an initial evaluation at High Point Hospital on 3 March 1993, and the multidisciplinary program was completed on 7 May 1993. During treatment, plaintiff espoused a strong return-to-work motivation and put forth good effort on physical therapy. Plaintiff exhibited no symptoms of RSD, according to his doctor there. After completing treatment, a functional capacity evaluation was ordered.
11. The functional capacity evaluation was performed on 18 May 1993. During the evaluation, plaintiff did not put forth maximum effort, and he magnified his symptoms. At the time of the evaluation, plaintiff was capable of performing work at light-medium physical requirements, and could work with the following restrictions: (a) lifting 35 pounds on an occasional basis; (b) lifting 15 pounds on a frequent basis; (c) lifting 7 pounds on a constant basis; (d) lifting 40 pounds from the floor to knuckle level, 41.5 pounds from knuckle level to shoulder level, and 36.5 pounds from shoulder level to over his head; and, (e) carrying 29 pounds for 100 feet. These restrictions were based on the functional capacity evaluation findings, and Dr. Curling concurred with these results. The functional capacity evaluation results were obtained when plaintiff was not putting forth maximum effort, and therefore represent minimum physical abilities.
12. On 3 June 1993, plaintiff reached maximum medical improvement (14 months after his injury), with a ten percent permanent partial impairment to the use of his back. This conforms to the degree of impairment that the N.C. Workers' Compensation Rating Guide associates with the surgery Dr. Curling performed, which was necessary due to the 23 April 1992 injury, and thus Dr. Curling associated it with that injury. However, this impairment is less than the 15 percent impairment for which he had already been compensated. When plaintiff was released from his prior injury, he retained a 15 percent permanent partial impairment to his back and was restricted to light-sedentary work. His percent of impairment and his restrictions were less after treatment for his second injury. This reduction in his impairment is consistent with his medical condition, because following the second injury the pre-existing bulge/herniation of his spinal column was surgically repaired.
13. From 24 April 1992 through 3 June 1993 plaintiff was not capable of performing his regular job with defendant, nor was he capable of performing any other gainful employment. The cause for plaintiff's inability to be gainfully employed was the incident at work on 23 April 1992 and the resulting injury to his back. From 4 June 1993 and continuing, plaintiff was capable of performing work with restrictions as found in Paragraph 11 above. Plaintiff has made no effort to return to gainful employment. In light of plaintiff's successful return to employment in 1991, his age, his education, his work experience, and his degree of impairment, plaintiff has not made a reasonable effort under the circumstances to obtain gainful employment. After 3 June 1993, in light of his work history and physical condition, plaintiff was capable of earning wages. Plaintiff has not shown that thereafter he was incapable of earning the same or greater wages than at the time of the subject injury. Defendant has not provided plaintiff with vocational rehabilitation. However, it was reasonable and appropriate for defendant not to provide vocational rehabilitation because plaintiff had claimed to be permanently and totally disabled and unable to obtain any employment, although he had actually been able to return to work under similar circumstances following his first back injury. It would be futile for defendant to perform the long and expensive process of vocational rehabilitation when plaintiff would tell prospective employers in any job interview, as he testified at the hearing, that he is physically unable to perform any job.
14. Plaintiff's testimony regarding his physical condition is not deemed credible, based on the first hand evaluation of the hearing Deputy, and in part, on the following:
 a. Plaintiff has claimed physical problems which had no anatomical explanation;
 b. Plaintiff has claimed physical problems when objective tests have been within normal limits; and
 c. Plaintiff magnified his symptoms during a functional capacity evaluation.
15. After 4 June 1993, plaintiff received additional medical treatment. The treatment provided by Dr. Curling, his treating physician, was made necessary as a result of the incident of 23 April 1992 and the resulting injury to plaintiff's back. However, the treatment provided by Dr. Edward Hill, Jr., was not necessary as a result by the incident of 23 April 1992, because plaintiff did not suffer from RSD. The finding that plaintiff did not suffer from RSD is based on the following:
 1. Dr. Russell at High Point Hospital found no evidence of RSD;
 2. Dr. Curling was not comfortable with the diagnosis of RSD while treating plaintiff; and
 3. Dr. Hill based his opinions on plaintiff's subjective complaints (all objective indications were within normal limits) and the complaints by plaintiff, in light of his history and the medical evidence, were not deemed credible.
The treatment by Dr. Alan Graham after 4 June 1993 was not made necessary as a result of the incident of 23 April 1992 at work and the resulting injury to plaintiff's back. Plaintiff was entitled to a second opinion examination by Dr. Hill.
* * * * * * * * * * * * *
The foregoing stipulations and findings of fact engender the following:
CONCLUSIONS OF LAW
1. On 23 April 1992 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2 (6).
2. On 23 April 1992 plaintiff's average weekly wage was $520.00 per week, yielding a compensation rate of $346.68. N.C. Gen. Stat. § 97-2 (5).
3. As a result of the injury by accident of 23 April 1992, plaintiff is entitled to temporary total disability compensation in the amount of $346.68 per week for the period of time from 23 April 1992 through 3 June 1993. N.C. Gen. Stat. § 97-29.
4. Defendants shall have a credit for any amount of temporary total disability compensation previously paid to plaintiff. N.C. Gen. Stat. § 97-42.
5. As a result of the injury by accident of 23 April 1992, plaintiff is not entitled to any permanent partial disability compensation. N.C. Gen. Stat. § 97-31; Schrum v. CatawbaUpholstering Co., 214 N.C. 353, 355, 199 S.E.2d 385 (1938).
6. Plaintiff is entitled to the payment of all medical compensation expenses incurred, or to be incurred, as a result of the injury by accident of 23 April 1992. Said medical expenses do not include charges for treatment provided by Dr. Hill, or Dr. Graham after 3 June 1993. They include those for the initial visit and second opinion evaluation by Dr. Hill. N.C. Gen. Stat. §§ 97-25; 97-27(b); 97-90(e).
* * * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law the Full Commission enters the following
AWARD
1. Subject to a credit for any temporary total disability compensation paid to plaintiff after 23 April 1992, defendant shall pay plaintiff temporary total disability compensation in the amount of $346.68 per week for the period from 23 April 1992 through 3 June 1993. As said amount has accrued, payment shall be made in a lump sum, subject to the attorney's fee approved below.
2. Plaintiff's claim for permanent partial disability compensation pursuant to the North Carolina Workers' Compensation Act must be, and the same hereby is, DENIED.
3. Defendants shall pay all medical compensation expenses incurred, or to be incurred, by plaintiff as a result of the injury by accident of 23 April 1992 when they have been submitted to the carrier and approved pursuant to the rules of the Commission, including charges for treatment provided by Dr. Curling after 4 June 1993, unless and until defendants shall have withdrawn their agreement to pay for it, and the evaluation, but not any treatment, provided by Dr. Hill; but, shall not include any treatment provided by Dr. Graham after 3 June 1993.
4. A reasonable attorney's fee equal to 25 percent of compensation due plaintiff is hereby approved for plaintiff's counsel, and shall be paid by deducting 25 percent from any compensation due plaintiff and forwarding same directly to plaintiff's counsel.
5. Each side shall pay their own costs, except that defendants shall pay an expert witness fee in the amount of $360.00 to Dr. Curling, $265.00 to Dr. Hill, and $350.00 to Dr. Graham.
6. Plaintiff's Motion to Reopen the Evidence is DENIED.Keel v. HV, Inc., 107 N.C. App. 536, 543, 421 S.E.2d 362 (1992).
 S/ __________________ J. RANDOLPH WARD COMMISSIONER
CONCURRING: S/ __________________ DIANNE S. SELLERS COMMISSIONER
S/ __________________ LAURA K. MAVRETIC COMMISSIONER
JRW:md 2/12/97